**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA,

                        Petitioner,

vs.                                  Case No. 3:16-cv-1247-J-39JRK

JAMES N. GOWER and VALENCIA D.
GOWER,

                        Respondents.
_____/

## OPINION AND ORDER[1]

### I. Status

This cause is before the Court on the Petition for Judicial Approval of a Levy upon a Principal Residence (Doc. No. 1; "Petition"), filed September 29, 2016, that seeks this Court's approval of an Internal Revenue Service ("IRS") administrative levy on the principal residence of James N. Gower and Valencia D. Gower ("Respondents") to satisfy Respondents' unpaid federal income tax liabilities for the 2008 through 2013 tax years. Petition at 2. In support of the Petition, Petitioner submitted the sworn declaration of Revenue Officer Lindsey Williams. See Declaration of Lindsey Collins[2] in Support of Petition for Judicial Approval of a Levy upon a Principal Residence (Doc. No. 1-1; "Declaration"), filed

---

[1]     Pursuant to 26 U.S.C. § 6334(e)(1)(A), a United States Magistrate Judge has jurisdiction to enter an order on a petition seeking the court's approval to levy upon a taxpayer's principal residence, such as the one presently before the Court. See also Order, United States v. Saylor, No. 2:08-cv-300-FtM-34SPC (M.D. Fla. Aug. 11, 2008), Doc. No. 12 (vacating report and recommendation based on the jurisdiction of a United States Magistrate Judge to approve a levy against a principal residence).

[2]     Although the Declaration refers to the revenue officer as Lindsey Collins, she has since married and changed her name to Lindsey Williams. See Transcript of February 22, 2017 Evidentiary Hearing (Doc. No. 16; "Transcript" or "Tr.") at 11. The Court refers to her as Revenue Officer Williams.

September 29, 2016. Through its Petition and the Declaration, Petitioner has made a prima facie showing that the levy is appropriate by representing that: 1) Respondents were given notice of the tax assessments and demands for payment, but they have failed to pay the liabilities in full; 2) the IRS has satisfied all necessary legal requirements and administrative procedures; and 3) the IRS "has exhausted all reasonable alternative means of collecting . . . Respondents' tax debt, and no reasonable alternatives exist to satisfy Respondents' unpaid tax liabilities." Petition at 3-4; see also Declaration at 2-3.

After the Petition was filed, the Court entered an Order to Show Cause directing Respondents to file a written response showing why the Court should not grant the Petition. See Order to Show Cause (Doc. No. 5), entered October 5, 2016, at 3. Subsequently, Respondents filed their response to the Order to Show Cause. See Respondents' Response to Order to Show Cause and Request for Hearing (Doc. No. 10; "Response"), filed November 23, 2016. In the Response, Respondents requested an evidentiary hearing and argued that: (1) the Petition is premature; (2) the assessment of tax for tax year 2008 may be "improper or erroneous"; (3) a levy on Respondents' home would "create an extreme hardship" on Respondents; and (4) Respondents have been unable to satisfy their tax liabilities because of "extreme personal hardship and a lack of funds, not an intent to avoid their tax obligations." Response at 1-4. The Court granted Respondents' request for an evidentiary hearing and took the matter under advisement. Order (Doc. No. 11), entered November 30, 2016, at 1.

On February 3, 2017, Petitioner filed its Memorandum in Support of Petition for Judicial Approval of a Levy upon a Principal Residence (Doc. No. 14; "Petitioner's Mem.").

In its Memorandum, Petitioner argues that Respondents "do not identify any assets (other than their house) which could be used to pay all or part of their tax debt." Petitioner's Mem. at 4. With regard to Respondents' argument that the assessment of tax for 2008 may be erroneous, Petitioner asserts that "[t]he merits of the underlying tax liability[ ] . . . are not a proper basis for challenging the Petition." Id. at 4-5. Lastly, Petitioner contends that "it is not the function of this Court to decide whether or not the proposed levy will constitute an economic hardship to [Respondents]." Id. at 5.

On February 22, 2017, the Court held an evidentiary hearing at which it heard testimony from Revenue Officer Williams; Mrs. Gower's brother, James C. Dubberly, Jr.; and Respondents. See Clerk's Minutes (Doc. No. 15) at 1; Transcript. The Court received Petitioner's Exhibits 1-9, with no objection from Respondents; Respondents' Exhibits 1-2, over Petitioner's objections; and Respondents' Exhibits 3-11, with no objection from Petitioner. See Clerk's Minutes at 2. At the end of the hearing, the Court directed Respondents to file a supplemental memorandum and Petitioner to file a response. See Tr. at 160; Clerk's Minutes. The Court also allowed the parties to file replies. Tr. at 155-59; Clerk's Minutes at 2.

Respondents' Memorandum in Response and Objection to Petition (Doc. No. 18; "Respondents' Mem.") was filed on April 25, 2017. In general, Respondents argue that the Petition should be denied for three reasons: 1) Petitioner failed to establish that there are no reasonable alternatives for collection; 2) Revenue Officer Williams did not properly consider whether Respondents qualified for an Effective Tax Administration Offer ("ETA Offer") as an alternative for collection; and 3) the Petition is not ripe because levy of Respondents'

residence is barred by the pending installment agreements. See Respondents' Mem. at 14-20. Petitioner filed its Response in Support of Petition for Judicial Approval of a Levy upon a Principal Residence (Doc. No. 19; "Petitioner's Resp.") on May 31, 2017. Respondents then filed a Reply on June 14, 2017. See Respondents' Reply to Petitioner's Response in Support of Petition for Judicial Approval of a Levy upon a Principal Residence (Doc. No. 20; "Reply"). On June 28, 2017, Petitioner filed a Sur-Reply. See Sur-Reply in Support of Petition for Judicial Approval of a Levy upon a Principal Residence (Doc. No. 21; "Sur-Reply").[3]

## II. Legal Framework

### A. Requirements for Levy on Taxpayer's Principal Residence/Release of Levy

Federal law provides that if a person "liable to pay any tax" fails to pay said tax after receiving a demand to do so, a lien arises "in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321. The IRS is authorized to collect such tax "by levy upon all property and rights to property . . . belonging to such person or on which there is a lien . . . for the payment of such tax." 26 U.S.C. § 6331(a).

Prior to the levy, the IRS must provide to the taxpayer written notice of its intent to levy and notice of the taxpayer's right to a pre-levy Collection Due Process ("CDP") hearing. 26 U.S.C. §§ 6330(a)(1), 6331(d)(1); 26 C.F.R. § 301.6330-1(a)(1). These notices must be provided at least thirty days before the levy, and they must be "given in person," "left at the [taxpayer's] dwelling or usual place of business," or "sent by certified or registered mail,

_____

[3] The arguments advanced by the parties in the post-hearing filings are discussed in more detail infra at Part IV.

return receipt requested, to [the taxpayer's] last known address." 26 U.S.C. §§ 6330(a)(2), 6331(d)(2).

If the taxpayer wishes to have a CDP hearing, he or she must request a hearing within thirty days of receipt of the CDP Notice, 26 C.F.R. § 301.6330-1(b)(1), and the request must be in writing and state the grounds for the requested hearing, 26 U.S.C. § 6330(b)(1). At the CDP hearing, the taxpayer may raise any issue relevant to the tax liability or the proposed levy, including challenges to the "appropriateness of the collection actions" and to the amount of the underlying tax liability. 26 U.S.C. § 6330(c)(2).

The taxpayer's principal residence is exempt from levy unless "a judge or magistrate [judge] of a district court of the United States approves (in writing) the levy of such residence." 26 U.S.C. § 6334(e)(1)(A). The Government initiates the proceeding for judicial approval of levy on a principal residence by filing a petition showing that: 1) "the underlying liability has not been satisfied"; 2) "the requirements of any applicable law or administrative procedure relevant to the levy have been met"; and 3) "no reasonable alternative for collection of the taxpayer's debt exists." 26 C.F.R. § 301.6334-1(d)(1). In the petition, the Government "will ask the court to issue to the taxpayer an order to show cause why the principal residence property should not be levied and will also ask the court to issue a notice of hearing." Id.

The taxpayer is then granted a hearing to rebut the Government's prima facie case if the taxpayer files an objection within the time period specified by the court "raising a genuine issue of material fact demonstrating" one or more of the following: 1) "the underlying tax liability has been satisfied"; 2) "the taxpayer has other assets from which the liability can

be satisfied"; or 3) "the [IRS] did not follow the applicable laws or procedures pertaining to the levy." 26 C.F.R. § 301.6334-1(d)(2). "The taxpayer is not permitted to challenge the merits underlying the tax liability in the proceeding." Id. Failure to file a timely objection may result in an order approving the levy. Id.

If the levy is approved by the Court and issued by the IRS, "[a] taxpayer who wishes to obtain a release of [the] levy must submit a request for release in writing or by telephone to the district director for the Internal Revenue district in which the levy was made." 26 C.F.R. § 301.6343-1(c). The IRS "must release the levy upon all or a part of the property or rights to property levied upon if [it] determines" that "[t]he levy is creating an economic hardship due to the financial condition of [the] individual taxpayer." 26 C.F.R. §§ 301.6343-1(b), (b)(4)(i). A levy results in economic hardship if "satisfaction of the levy in whole or in part [would] cause [the] individual taxpayer to be unable to pay his or her reasonable basic living expenses." 26 C.F.R. § 301.6343-1(b)(4)(i).[4] If the taxpayer submits a request for release

---

[4]     The IRS determines the taxpayer's reasonable basic living expenses by considering "any information provided by the taxpayer," including the following:

> (A) The taxpayer's age, employment status and history, ability to earn, number of dependents, and status as a dependent of someone else;
>
> (B) The amount reasonably necessary for food, clothing, housing (including utilities, home-owner insurance, home-owner dues, and the like), medical expenses (including health insurance), transportation, current tax payments (including federal, state, and local), alimony, child support, or other court-ordered payments, and expenses necessary to the taxpayer's production of income (such as dues for a trade union or professional organization, or child care payments which allow the taxpayer to be gainfully employed);
>
> (C) The cost of living in the geographic area in which the taxpayer resides;
>
> (D) The amount of property exempt from levy which is available to pay the taxpayer's expenses;
>
> (E) Any extraordinary circumstances such as special education expenses, a medical catastrophe, or natural disaster; and

(continued...)

based on economic hardship, the IRS is required to determine whether the levy is creating a hardship unless the request "is made five or fewer days prior to a scheduled sale of the property to which the levy relates." 26 C.F.R. § 301.6343-1(c)(3)(iii).

## B. Alternative Methods of Collection

Taxpayers who are unable to pay their tax liability in full have several alternatives to enforced collection by the IRS. According to the Internal Revenue Manual ("IRM"), the IRS is "required to <u>consider</u> alternative methods of collection prior to seizure." IRM 5.10.1.4.2(1), 2007 WL 9622073, at *1. The two alternative methods of collection relevant in this matter—the Offer in Compromise ("OIC") and the installment agreement—are discussed below.

### 1. Offer in Compromise

An OIC is an offer made by the taxpayer to the IRS to enter into "a contract . . . in which the IRS agrees to accept an amount different from what the taxpayer owes in taxes." <u>Begner v. United States</u>, 428 F.3d 998, 999 (11th Cir. 2005); <u>see also</u> 26 C.F.R. § 601.203.[5] Taxpayers seeking to make an OIC must submit a Form 656 to the IRS pursuant to 26 C.F.R. § 601.203(b). Any compromise of a tax liability by the IRS must be made "prior to reference [of the matter] to the Department of Justice (['DOJ')] for prosecution or defense."

---

[4](...continued)
  (F) Any other factor that the taxpayer claims bears on economic hardship and brings to the attention of the director.

26 C.F.R. § 301.6343-1(b)(4)(ii).

[5]    The Code of Federal Regulations ("Regulation(s)") does not expressly state that OICs may be submitted only by the taxpayer. <u>See</u> 26 C.F.R. § 601.203. The federal statutes, Regulations, and IRM sections relating to OICs, however, are premised on the taxpayer making the OIC and the IRS accepting or rejecting it. <u>See, e.g.</u>, 26 U.S.C. § 7122; 26 C.F.R. § 601.203(c)(1), (3); IRM 5.8.11.1(4).

26 U.S.C. § 7122(a).[6] There are three grounds for such a compromise: 1) doubt as to liability;[7] 2) doubt as to collectibility;[8] and 3) promotion of effective tax administration. 26 C.F.R. § 301.7122-1(b). Offers that are considered on the ground of promoting effective tax administration are also referred to as ETA Offers. <u>See</u> IRM 5.8.11.1(1).

The IRS may accept an ETA Offer if "the Secretary determines that, although collection in full could be achieved, collection of the full liability would cause the taxpayer economic hardship within the meaning of [26 C.F.R.] § 301.6343–1." 26 C.F.R. § 301.7122-1(b)(3)(i).[9] There are a number of non-exclusive factors that support a finding that collection would cause economic hardship for purposes of an ETA Offer:

> (A) Taxpayer is incapable of earning a living because of a long term illness, medical condition, or disability, and it is reasonably foreseeable that taxpayer's financial resources will be exhausted providing for care and support during the course of the condition;
>
> (B) Although taxpayer has certain monthly income, that income is exhausted each month in providing for the care of dependents with no other means of support; and
>
> (C) Although taxpayer has certain assets, the taxpayer is unable to borrow against the equity in those assets and liquidation of those assets to pay outstanding tax liabilities would render the taxpayer unable to meet basic living expenses.

26 C.F.R. § 301.7122-1(c)(3)(i).

---

[6]  The "Attorney General or his delegate" is authorized to compromise a tax liability after reference of the case to the DOJ for prosecution or defense. 26 U.S.C. § 7122(a).

[7]  "Doubt as to liability exists where there is a genuine dispute as to the existence or amount of the correct tax liability under the law." 26 C.F.R. § 301.7122-1(b)(1).

[8]  "Doubt as to collectibility exists in any case where the taxpayer's assets and income are less than the full amount of the liability." 26 C.F.R. § 301.7122-1(b)(2).

[9]  Economic hardship is defined <u>supra</u> at Part II.A.

If doubt as to liability, doubt as to collectibility, and economic hardship do not constitute grounds for compromise, the IRS may accept an ETA Offer "where compelling public policy or equity considerations identified by the taxpayer provide a sufficient basis for compromising the liability." 26 C.F.R. § 301.7122-1(b)(3)(ii). This ground for compromise requires that the taxpayer show "exceptional circumstances" that would cause collection of the full liability to "undermine public confidence that the tax laws are being administered in a fair and equitable manner." Id. Further, "[n]o compromise to promote effective tax administration may be entered into if compromise of the liability would undermine compliance by taxpayers with the tax laws." 26 C.F.R. § 301.7122-1(b)(3)(iii).

### 2. Installment Agreement

The IRS is authorized "to enter into written agreements with any taxpayer under which such taxpayer is allowed to make payment on any tax in installment payments if the [IRS] determines that such agreement will facilitate full or partial collection of such liability." 26 U.S.C. § 6159(a). The IRS is not required to enter into an installment agreement unless the tax liability is $10,000 or less and certain conditions are met. See 26 U.S.C. § 6159(c).

"No levy may be made to collect a tax liability that is the subject of an installment agreement during the period that a proposed installment agreement is pending with the IRS,[10] for [thirty] days immediately following the rejection of a proposed installment agreement, during the period that an installment agreement is in effect, and for [thirty] days immediately following the termination of an installment agreement." 26 C.F.R. § 301.6159-

---

[10]    An installment agreement becomes pending "when it is accepted for processing." 26 C.F.R. §§ 301.6159-1(b)(2), 301.6331-4(a)(2).

1(f)(1); see also 26 C.F.R. § 301.6331-4(a)(1). Further, the IRS may not "refer a case to the [DOJ] for the commencement of a proceeding in court, against a person named in an installment agreement or proposed installment agreement, if levy to collect the liability is prohibited" during the three time periods set out above. 26 C.F.R. §§ 301.6159-1(f)(3)(ii), 301.6331-4(b)(2).

A levy is not prohibited during these time periods, however, if: 1) "the taxpayer files a written notice with the IRS that waives the restriction on levy . . ."; 2) "the IRS determines that the proposed installment agreement was submitted solely to delay collection"; or 3) "the IRS determines that collection of the tax to which the installment agreement or proposed installment agreement relates is in jeopardy." 26 C.F.R. §§ 301.6159-1(f)(2), 301.6331-4(a)(4). According to the IRM, "[t]he determination that the offer of an installment agreement is merely to delay collection must be apparent to any impartial observer, i.e., there is clearly no reality to the offer." IRM 5.11.1.4.8(4), 2007 WL 9242947 at *2. The IRM provides the following as an example: "The taxpayer offers to make a periodic, token payment such as $1 a month." Id. Collection is considered to be in jeopardy only if at least one of the conditions allowing a jeopardy assessment exists. Id.[11]

## III. Findings of Fact

Respondents, a married couple, are residents of Fernandina Beach, Florida where the residence at issue ("the Property") is located. See Tr. at 26, 103; Petitioner's Ex. 6 (Doc.

---

[11] The conditions under which a jeopardy assessment may be made are found in IRM 1.2.13.1.27(5), 2007 WL 2989240, at *1. Whether collection is considered to be in jeopardy is not at issue here.

No. 15-7 at 2) (general warranty deed).[12] Respondents purchased the Property in May 2013 for $242,290.92, using all the proceeds from the sale of their former residence in Tampa, Florida ($223,152.20). Petitioner's Ex. 8 (Doc. No. 15-9 at 4) (settlement statement for the purchase of the Property); id. at 3 (settlement statement for the sale of the Tampa residence); Tr. at 145 (Mrs. Gower's testimony). At the time of the purchase, Respondents had outstanding tax liabilities for tax years 2008 through 2011.[13] See Petitioner's Ex. 1 (Doc. No. 15-2 at 3-23).

Mr. Gower is a certified public accountant and a certified internal auditor. Tr. at 110. Mr. Gower testified his last position as an internal auditor ended in 2008 when "the economy went down" and his employer eliminated his job. Tr. at 111. His subsequent attempts at securing employment in that field were unsuccessful. See Tr. at 112-13, 125.[14] He applied for retail jobs, but was also unsuccessful. Tr. at 126.[15] He was later able to obtain

---

[12]     The parties' exhibits to the evidentiary hearing are collectively filed under Doc. No. 15, with Petitioner's being Doc. Nos. 15-2 through 15-10, and Respondents' being Doc. Nos. 15-12 through 15-22. Some exhibits do not contain page numbers, and some exhibits contain page numbers that are not sequential. For ease of reference, citations to every exhibit follow the pagination assigned by the Court's electronic filing system (CM/ECF).

[13]     At the time of the purchase, Respondents did not yet owe income taxes for tax year 2012 because they obtained an extension of time to file their 2012 tax return. See Petitioner's Ex. 1 (Doc. No. 15-2 at 25). They timely filed it in October 2013. See id.

[14]     Mr. Gower testified that after his job was eliminated in 2008, he sought employment at Jacksonville Electric Authority ("JEA") and at Siemens in Orlando, Florida, but he was not hired. Tr. at 112-113. Regarding his application with JEA, he stated that "the background check apparently stopped [him] from getting that job." Tr. at 125. He testified he does not know specifically what prevented him from being hired, but stated that it was "[p]robably this tax lien." Tr. at 126.

[15]     Mr. Gower testified he "applied for a stocking job at ABC" but was not hired, he assumed, because of the background check. Tr. at 126. He also sought employment at T.J. Maxx, but did not receive an interview. Tr. at 126.

employment in the insurance sales business and has worked in the field since.[16] See Tr. at

113, 124-25; Respondents' Ex. 3 (Doc. No. 15-14 at 39).

Mrs. Gower has a bookkeeping business, but by 2009 she had only one client, and

in 2012 that client stopped doing business with Mrs. Gower. Tr. at 133-34; see also

Respondents' Ex. 4 (Doc. No. 15-15 at 5); Respondents' Ex. 5 (Doc. No. 15-16 at 5);

Respondents' Ex. 6 (Doc. No. 15-17 at 5); Respondents' Ex. 7 (Doc. No. 15-18 at 6);

Respondents' Ex. 8 (Doc. No. 15-19 at 5); Respondents' Ex. 9 (Doc. No. 15-20 at 7);

Respondents' Ex. 10 (Doc. No. 15-21 at 4); Respondents' Ex. 11 (Doc. No. 15-22 at 6).[17]

She also works part time as a secretary at a lawyer's office. Respondents' Ex. 3 (Doc. No.

15-14 at 39); Tr. at 140. She testified she "go[es] on the internet every day looking for

administrative bookkeeping jobs that pay more than what [she is] making now." Tr. at 151.[18]

In their 2015 tax return, filed in October 2016, Respondents reported that their total income

was $15,708 and that their adjusted gross income was $13,359. Respondents' Ex. 11 (Doc.

---

[16]     Mr. Gower did not specify when he began working in the insurance sales business;
according to the tax returns, it appears it was in 2010. See Respondents' Ex. 5 (Doc. No. 15-16 at 3);
Respondents' Ex. 6 (Doc. No. 15-17 at 7); Respondents' Ex. 7 (Doc. No. 15-18 at 8); Respondents' Ex. 8
(Doc. No. 15-19 at 7); Respondents' Ex. 9 (Doc. No. 15-20 at 5); Respondents' Ex. 10 (Doc. No. 15-21 at
5); Respondents' Ex. 11 (Doc. No. 15-22 at 4).

[17]     Although Mrs. Gower testified she did not have any clients by sometime in 2012, the tax
returns for tax years 2012 through 2015 show that she derived income from her bookkeeping business. See
Respondents' Ex. 8 (Doc. No. 15-19 at 5); Respondents' Ex. 9 (Doc. No. 15-20 at 7); Respondents' Ex. 10
(Doc. No. 15-21 at 4); Respondents' Ex. 11 (Doc. No. 15-22 at 6).

[18]     At the hearing, Mr. Dubberly indicated that Respondents have been unable to obtain
employment because of "background checks." Tr. at 106-07. When Mrs. Gower was asked to name the
positions she had applied for but was unable to obtain due to background checks, she testified she applied
to work at "Randstad," AT&T, and "Baptist Hospitals," but she could not "remember any others specifically."
Tr. at 152-53. Mrs. Gower then stated, however, that she did not provide any background information in the
job applications, and that she "just fill[ed] out . . . a generic application." Tr. at 152-53.

No. 15-22 at 2) (2015 tax return); Petitioner's Ex. 1 (Doc. No. 15-2 at 35) (showing filing date).

As noted above, at issue in this case are Respondents' unpaid federal income tax liabilities for the 2008 through 2013 tax years. For these tax years, Respondents filed joint federal income tax returns reporting unpaid income taxes.[19] See Petitioner's Ex. 1 (Doc. No. 15-2 at 3-4, 10, 15, 20, 25, 29); Respondents' Ex. 4 (Doc. No. 15-15) (2008 tax return); Respondents' Ex. 5 (Doc. No. 15-16) (2009 tax return); Respondents' Ex. 6 (Doc. No. 15-17) (2010 tax return); Respondents' Ex. 7 (Doc. No. 15-18) (2011 tax return); Respondents' Ex. 8 (Doc. No. 15-19) (2012 tax return); Respondents' Ex. 9 (Doc. No. 15-20) (2013 tax return). Consequently, the IRS made assessments against Respondents for unpaid federal income taxes, penalties, and interest. Declaration at 2. Despite these assessments, however, Respondents have not paid the liability in full.[20] Id. at 3. According to IRS records, as of November 16, 2016, Respondents owe $153,235.45 in federal income taxes, penalties, and interest. See Petitioner's Ex. 1 (Doc. No. 15-2 at 8 (reporting a balance of $68,919.63 for tax year 2008), 13 (reporting a balance of $12,894.48 for tax year 2009), 18 (reporting a balance

---

[19]    The tax returns for tax years 2008 through 2010 were filed late even though Respondents were given extensions of time to file the returns. See Petitioner's Ex. 1 (Doc. No. 15-2 at 3, 10, 15) (showing filing dates and extensions). Respondents timely filed their tax returns for 2011 through 2013 after receiving extensions of time to file the returns. See Petitioner's Ex. 1 (Doc. No. 15-2 at 20, 25, 29) (showing filing dates and extensions).

[20]    For tax years 2008 through 2013, Respondents paid a total of $94,195 in income tax withholdings: $10,019 in 2008; $8,548 in 2009; $12,434 in 2010; $9,098 in 2011; $19,130 in 2012; and $34,966 in 2013. Respondents' Ex. 4 (Doc. No. 15-15 at 3) (2008); Respondents' Ex. 5 (Doc. No. 15-16 at 3) (2009); Respondents' Ex. 6 (Doc. No. 15-17 at 3) (2010); Respondents' Ex. 7 (Doc. No. 15-18 at 3) (2011); Respondents' Ex. 8 (Doc. No. 15-19 at 3) (2012); Respondents' Ex. 9 (Doc. No. 15-20 at 3) (2013). Mrs. Gower testified that in the 2008 tax return, Respondents self-reported that they owed, approximately, an additional $30,000. Tr. at 130-31; compare Petitioner's Ex. 1 (Doc. No. 15-2 at 3) ($8,789 in tax assessed) with Respondents' Ex. 4 (Doc. No. 15-15 at 3) ($38,806 in total tax owed). In February 2012, Respondents made a payment toward their 2008 taxes in the amount of $3,522.96. Petitioner's Ex. 1 (Doc. No. 15-2 at 3).

of $13,962.16 for tax year 2010), 23 (reporting a balance of $18,508.39 for tax year 2011), 27 (reporting a balance of $22,975.01 for tax year 2012), 30 (reporting a balance of $15,975.78 for tax year 2013), 33 (reporting a balance of $0 for tax year 2014), 36 (reporting a balance of $0 for tax year 2015)). Interest and penalties continue to accrue.

Respondents never made an OIC, Tr. at 37, but they did request installment agreements when they filed their 2008 through 2012 tax returns. When they filed their 2008 tax return, they requested an installment agreement of $1.00 per month, and with the 2009 through 2011 tax returns they requested $20.00 per month. See Respondents' Ex. 4 (Doc. No. 15-15 at 10) (2008 tax return); Respondents' Ex. 5 (Doc. No. 15-16 at 16) (2009 tax return); Respondents' Ex. 6 (Doc. No. 15-17 at 14) (2010 tax return); Respondents' Ex. 7 (Doc. No. 15-18 at 12) (2011 tax return). They did not request an installment agreement for tax years 2012 and 2013. See Respondents' Ex. 8 (Doc. No. 15-19) (2012 tax return); Respondents' Ex. 9 (Doc. No. 15-20) (2013 tax return). At the hearing, when asked whether she believed the IRS would accept these requests, Mrs. Gower testified that "[a]t least [she] would get some type of response, where [the IRS] could contact [her] and say, [t]his is what we need to do, this is how it works." Tr. at 150. On January 23, 2014, a computer input code for a pending installment agreement was entered into the IRS's electronic account. See Petitioner's Ex. 1 (Doc. No. 15-2 at 5, 11, 16, 21, 25). The record does not show any other activity regarding the installment agreement requests.

The IRS filed a lien on the Property in March 2014. Respondents' Ex. 3 (Doc. No. 15-14 at 11) (March 19, 2014 note indicating the "[l]ien was filed in . . . Nassau [C]ounty"). The lien was recorded on March 31, 2014 for tax years 2008 through 2012. See id. at 41. On

January 22, 2015, the IRS recorded a lien on the Property for tax year 2013. See id. The Property is not subject to any mortgages, but it is subject to property taxes in the amount of $9,050.27 and a $3,116.28 lien from Amelia National Golf Club, all of which are superior to the tax lien. Declaration at 3-4.

On August 5, 2014, Revenue Officer Williams conducted a field visit to the Property[21] during which she met with Mrs. Gower. Respondents' Ex. 3 (Doc. No. 15-14 at 18). Revenue Officer Williams directed Mrs. Gower to obtain a loan from three different banks on the equity of the Property, but Mrs. Gower did not "seem very willing to do this." Id.; Tr. at 89.[22] Revenue Officer Williams advised Mrs. Gower that if she were unwilling to explore collection alternatives, the next enforcement action would be to issue a levy on the Property. Respondents' Ex. 3 (Doc. No. 15-14 at 18, 42); Tr. at 89.

During the field visit, Revenue Officer Williams provided Mrs. Gower with documents containing information about the collection process and explained them to her. See Respondents' Ex. 3 (Doc. No. 15-14 at 18, 42); Tr. at 41-42. Revenue Officer Williams specifically testified this information covered OICs. Tr. at 42. Her testimony is corroborated by her internal records that show Respondents were provided with a copy of Publications 1, 594, and 1660 during the field visit. See Respondents' Ex. 3 (Doc. No. 15-14 at 42) (indicating Respondents were provided with copies of Publications 1, 594, and 1660 "with instructions"); id. at 18 (indicating Revenue Officer Williams explained the contents of

---

[21]     She also conducted a field visit in March 2014, but Respondents were not home at the time. See Respondents' Ex. 3 (Doc. No. 15-14 at 9).

[22]     Mr. Gower testified they attempted to secure a loan on the Property "at three different banks" but were unsuccessful, he "suppose[d]," due to their "unreliable income." Tr. at 115. Revenue Officer Williams confirmed that Respondents tried to obtain loans on the Property. Tr. at 90.

Publications 1, 594, and 1660 to Mrs. Gower). Publication 594 describes the process of applying for an OIC. <u>See</u> IRS Pub. 594, 2012 WL 8144686, at *4. During their testimony, Respondents were equivocal about whether they received information about OICs. <u>See</u> Tr. at 115, 132, 150.[23] The undersigned credits Revenue Officer Williams's testimony that she provided Respondents with documents containing information about OICs.[24]

Shortly after the revenue officer's August 5, 2014 field visit, Respondents hired Aurora Capital Solutions ("Aurora") as their representative and authorized it to act on their behalf in all transactions with the IRS. Tr. at 120, 131-32, 145. By letter dated August 29, 2014, Aurora sent the following documents to the IRS: the last six months of Respondents' bank statements; Mr. Gower's earned commissions "year-to-date"; copies of their life insurance policies, car insurance policy, and homeowner's insurance policy; tax statements; and registrations for two of their three vehicles.[25] Petitioner's Ex. 4 (Doc. No. 15-5 at 2). In October 2014, Aurora submitted a Collection Information Statement ("CIS") to the IRS

---

[23]    Respondents' testimony with regard to whether the IRS provided them with information about OICs was unclear and evasive. Mr. Gower testified he did not see any documents regarding OICs, but he did not expressly deny that he received them. Tr. at 115. Mrs. Gower initially testified she did not recall Revenue Officer Williams providing her with any paperwork about OICs, Tr. at 132, but she later testified that she remembered reading "the form about . . . the income and expense statement about doing that," but that she did not remember what other documents she received from the revenue officer, Tr. at 150.

[24]    In making credibility determinations, courts consider various factors including a witness's demeanor, the consistencies or inconsistencies within the witness's testimony, and any interest the witness may have in the outcome of the hearing; but the Court does not consider the official rank or status of the witness. <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 749-50 (11th Cir. 2002); <u>see also</u> <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 575 (1985) (indicating various factors to consider when making credibility determinations, such as demeanor, inflection of voice, and whether the testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it"). Here, the Court has considered the relevant factors in making the credibility determination.

[25]    Only the six months of bank statements are part of the record. <u>See</u> Petitioner's Ex. 4 (Doc. No. 15-5 at 3-17) (copies of bank statements).

-16-

detailing Respondents' income and expenses.[26] See Petitioner's Ex. 2 (Doc. No. 15-3) (copy of CIS); Tr. at 55 (Revenue Officer Williams's testimony indicating that CIS was submitted by Aurora).[27] According to Revenue Officer Williams, Aurora did not provide sufficient supplemental documents to verify Respondents' income.[28] Tr. at 29-30, 55-56; Respondents' Ex. 3 (Doc. No. 15-14 at 34, 42).[29] On November 4, 2014, Aurora informed Revenue Officer Williams that Respondents' "parents are loaning money to them." Respondents' Ex. 3 (Doc. No. 15-14 at 27) (capitalization omitted).

Also on November 4, 2014, Revenue Officer Williams sent Respondents a "Summary of Taxpayer Contact" form requesting that Respondents provide certain information and take a number of actions by November 20, 2014. Petitioner's Ex. 5 (Doc. No. 15-6 at 2). Specifically, Respondents were requested to provide the following information: 1) the closing statement from the sale of their Tampa residence;[30] 2) the names of Respondents' parents who loaned Respondents money and copies of any available checks corresponding to such loans; and 3) the decisions on any loans requested on the equity of the Property. Id. Respondents were asked to take the following actions: 1) cash out $2,055 from their 401(k)

---

[26]     A CIS, also referred to as Form 433-B, "is used [by the IRS] to obtain current financial information necessary for determining how a wage earner or self-employed individual can satisfy an outstanding tax liability." IRS Pub. 1854, 2018 WL 2106630, at *1.

[27]     Revenue Officer Williams did not mention Aurora by name, but she referred to Respondents' "representative in Colorado." Tr. at 55. Aurora was based in Colorado. See, e.g., Petitioner's Ex. 7 (Doc. No. 15-8 at 10) (letter showing Aurora's address).

[28]     It appears the verification documents that were needed included "bank statements, wage statements, mortgage documentation, [and] encumbrance information for any vehicles." Tr. at 27.

[29]     IRS records refer to Aurora as "POA," which stands for "Power of Attorney." See Power of Attorney, IRS, https://www.irs.gov/charities-non-profits/power-of-attorney-3 (last visited July 10, 2018).

[30]     The form refers to a house in Orlando, but Revenue Officer Williams testified that this is an error and that "[i]t is supposed to be Tampa." See Tr. at 33.

and provide the IRS with the proceeds; 2) obtain a loan against the remaining cash value of their life insurance policies and provide the IRS with the proceeds; 3) make an "estimated payment" toward their 2014 taxes; and 4) try to sell the Property and provide the IRS with the proceeds. Id. According to Revenue Officer Williams, the IRS received the requested documents, but Respondents never attempted to sell the Property, no payments were made toward their 2014 taxes,[31] and the IRS never received any proceeds from any cashout of the 401(k) or loan against the cash value of the life insurance policies.[32] Tr. at 34; see also Respondents' Ex. 3 (Doc. No. 15-14 at 34, 36).

Revenue Officer Williams conducted an investigation of the Property and determined that its sale would yield $142,833.45 in net proceeds, "which would be sufficient to satisfy a significant portion of [Respondents'] outstanding federal tax liability." Declaration at 4. On January 12, 2015, the IRS sent Respondents and Aurora a notice informing Respondents of its intent to levy pursuant to 26 U.S.C. § 6331 and of Respondents' right to a CDP hearing. See Petitioner's Ex. 7 (Doc. No. 15-8 at 2-16). Respondents did not request a CDP hearing. Tr. at 28, 154-55. On March 25 and April 13, 2015, the IRS sent notices to Respondents and Aurora advising Respondents that they must pay the amount they owe to the IRS to prevent collection action. See Petitioner's Ex. 7 (Doc. No. 15-8 at 17-21 (notices dated March 25,

---

[31]     Although Respondents did not make a payment toward their 2014 taxes by the November 20, 2014 deadline, they did pay their 2014 taxes in April 2015. See Petitioner's Ex. 1 (Doc. No. 15-2 at 32).

[32]     In a letter dated January 27, 2015, Aurora notified the IRS that Respondents made a request to cash out their 401(k), and that they "had further conversations with the life insurance company to get something in writing, and they were eventually able to secure a loan in the amount of $7,000.00 for this." Petitioner's Ex. 9 (Doc. No. 15-10 at 2); see also id. at 12-13 (401(k) surrender request). The letter further states that "[t]he funds from the . . . two accounts will be remitted immediately upon receipt . . . ." Id. at 2. The record does not reflect that the IRS received the proceeds from these accounts, and Revenue Officer Williams confirmed she never received them. Tr. at 34; Respondents' Ex. 3 (Doc. No. 15-14 at 36). Respondents did not testify or argue otherwise.

2015), 22-26 (notices dated April 13, 2015)). On January 19, 2016, the IRS sent Respondents another notice that again advised them they must pay their outstanding tax liabilities to prevent enforced collection. See id. at 27-28.[33] Respondents testified they received these notices, but that they did not make any payments. Tr. at 146-47, 154.

In April 2015, Revenue Officer Williams submitted to several IRS officials a seizure memorandum recommending that the IRS commence a civil action seeking approval of a principal residence seizure in Respondents' case. See Respondents' Ex. 3 (Doc. No. 15-14 at 38-43). In the seizure memorandum, she stated that an "[OIC] and [i]nstallment [a]greement were considered," but "the equity in their homestead precludes acceptance of an OIC or [installment agreement]." Id. at 39.[34] She noted that "the [CIS Aurora] provided has minimal information regarding [Respondents'] financial situation." Id. at 42. She indicated that the information she received showed Respondents borrowed $20,000 from Mrs. Gower's mother. Id. Revenue Officer Williams found that "[n]o hardship will occur as a result of the principal residence seizure as it will not cause a change in [Respondents'] income and the mother will be able to continue to assist with living expenses." Id.[35] As noted above, the civil action was then commenced on September 29, 2016. See Petition.

_____

[33]     This notice was not sent to Aurora presumably because Aurora was no longer representing Respondents at the time. See Tr. at 145-46, 148-49 (Mrs. Gower's testimony that Aurora stopped representing Respondents around August 2015, but she did not know why).

[34]     This statement was apparently erroneous because Revenue Officer Williams testified that "no one would have considered [an OIC] because . . . one was not filed." Tr. at 64.

[35]     It appears Respondents borrowed the $20,000 in 2014. See Respondents' Ex. 3 (Doc. No. 15-14 at 30); Petitioner's Ex. 9 (Doc. No. 15-10 at 3-10). Mrs. Gower's mother has since passed away, but the record does not specify when. Tr. at 135-36.

At the hearing, Mr. Gower testified that Mrs. Gower "brings home $200 a week." Tr. at 118. Mrs. Gower stated that in 2016 she made $16,000 and Mr. Gower made "maybe $3,000." Tr. at 140-41. Mr. Gower testified that in April 2017 he would start receiving a pension of approximately $1,300 a month. Tr. at 115; see also Tr. at 138 (Mrs. Gower's testimony on Mr. Gower's anticipated pension). Mrs. Gower testified that Mr. Gower will be entitled to around $1,800 a month in social security benefits, and that although she will also collect benefits, she has not determined what those benefits will be. Tr. at 137. She testified that they have borrowed approximately $4,000 from Mr. Dubberly and, as noted above, they borrowed $20,000 from her mother. Tr. at 137, 135. According to Mrs. Gower, when her mother passed away, she received "about $4,000" from her mother's savings accounts. Tr. at 136. Mr. Gower testified that in the past they have "had to borrow from [his] 401(k) to pay . . . back taxes." Tr. at 119.

Mr. Gower stated that "[Mrs. Gower's] income is just not even keeping the lights on sometimes." Tr. at 117. He testified their vehicle has been at a repair shop for three weeks, but they have not retrieved it because they have been unable to pay $400 for the repairs. Tr. at 117-18. He further stated he owes $12,000 in costs to one of the insurance companies he worked for. Tr. at 114. He testified they have not been on vacation since 2009. Tr. at 119. Mrs. Gower represented that they are recipients of a food bank and that Mr. Gower goes there every week. Tr. at 136. According to Mrs. Gower, it would cost them "maybe $800 a month" to rent an apartment. Tr. at 141. She asserted that if they were to pay monthly rent, she does not know how they would pay their other living expenses. Tr. at 142.

Notwithstanding this testimony, Mrs. Gower admitted that they "were living beyond [their] means," and this was "one reason [they] sold the [Tampa] house and moved up here." Tr. at 119. (As noted, when Respondents moved and purchased the Property in May 2013, they already had outstanding tax liabilities for tax years 2008 through 2011. See Petitioner's Ex. 1 (Doc. No. 15-2 at 3-23)). Mrs. Gower testified that in 2014, they purchased tickets for the "SEC basketball tournament" in Atlanta because they "wanted to go see the game." Tr. at 140; see Tr. at 121 (Mr. Gower's testimony); Petitioner's Ex. 4 (Doc. No. 15-5 at 4) (bank statement showing purchase of tickets). Respondents testified they stayed at a hotel when they traveled to Atlanta for the game. See Tr. at 121-22, 140; Petitioner's Ex. 4 (Doc. No. 15-5 at 4) (bank statement showing hotel expenses).

Revenue Officer Williams testified that the bank statements from 2014 that Aurora submitted "show that [Respondents] are living above their means," and "living well beyond what the reasonable person would consider reasonable expenses." Tr. at 34-35. Specifically, she testified that "[t]here was lots of restaurants, eating out," as well as "large alcohol purchase[s]," and purchases at a "luxury nail spa." Tr. at 35. Revenue Officer Williams's testimony is consistent with the bank statements. See  Petitioner's Ex. 4 (Doc. No. 15-5 at 3-4, 6-7, 12-13, 15-16). Notably, as stated above, it was in 2014 that Respondents borrowed $20,000 from Mrs. Gower's mother. See Respondents' Ex. 3 (Doc. No. 15-14 at 30); Petitioner's Ex. 9 (Doc. No. 15-10 at 3-10). These expenditures, while not extravagant, tend to undermine Respondents' description of their alleged dire financial situation as well as call into question the suggestion that they had to borrow money from others because they could not afford necessities.

Mr. Dubberly testified that he is willing to enter into a compromise with the IRS to settle Respondents' debt. Tr. at 105. He stated that "[i]f the IRS wants a check, [he] can have them a cashier's check within [sixty] days for about $40,000," and "[i]f they want to go to a monthly installment, [he will] guarantee it up to [$]75,000." Tr. at 105. Mr. Dubberly has not contacted the IRS regarding this proposed settlement and has not provided the IRS with any financial information regarding Respondents' case. Tr. at 107-08.

## IV. Parties' Arguments

As previously noted, in its Petition and supporting Declaration, Petitioner made a prima facie showing that the levy upon the Property is appropriate by establishing the following: 1) Respondents have failed to pay the underlying liabilities in full; 2) the IRS has satisfied all necessary legal requirements and administrative procedures; and 3) the IRS has exhausted all reasonable alternatives for collection. Petition at 4; Declaration at 2-4; see 26 C.F.R. § 301.6334-1(d)(1). Respondents make three arguments in response: 1) Petitioner failed to establish that there are no reasonable alternatives for collection; 2) Revenue Officer Williams did not properly consider the applicability of an ETA Offer; and 3) the Petition is not ripe because levy of the Property is barred by the pending installment agreements.[36] See Respondents' Mem. at 14-20; Reply at 4-10. The undersigned first sets outs Respondents' arguments in turn. Then, Petitioner's contentions in response are discussed.

_____

[36]    Respondents also assert they "likely qualify for penalty abatements under 26 U.S.C. §§ 6651(a)(2) and 6651(a)(3) for failure to pay tax and failure to pay assessed tax on these liabilities and the twenty-five . . . percent late return filing penalty under 26 U.S.C. § 6651(a)(2) . . . ." Respondents' Mem. at 19-20. The undersigned does not address this argument as it challenges the merits underlying the tax liability, which Respondents are not permitted to challenge in this proceeding. See 26 C.F.R. § 301.6334-1(d)(2). Further, Respondents do not offer any legal authority indicating that the Court can require the IRS to reduce Respondents' penalties. See In re Atkinson, No. 8:08-MC-0110-T-30EAJ, 2009 WL 2187537, at *3 (M.D. Fla. May 13, 2009) (finding that the "[r]espondent cite[d] no legal authority for the proposition that the court can require the IRS to settle or forgive penalties and interest in lieu of seeking to levy upon a taxpayer's residence").

-22-

**A. Respondents' Arguments**

**1. Reasonable Alternatives for Collection**

Respondents argue that Petitioner "cannot establish that reasonable alternatives for collection do not exist." Respondents' Mem. at 15. They represent that they "do not dispute that they owe the tax liabilities" or "that the administrative procedure[s] have been met, at least to the extent that the administrative procedures only require the proper mailing of a Notice of Intent to Levy on the Taxpayer and the filing of a Notice of Federal Tax Lien." Id. In arguing that reasonable alternatives for collection do exist, Respondents point to Mr. Dubberly's offer to fund an OIC and the possibility of a private sale of the Property. See Reply at 7, 10. (As noted above, Respondents never submitted an OIC. Tr. at 37.) Respondents assert that "[p]rior to contacting tax counsel, [they] were unaware of the applicability of an ETA Offer to their situation," and that "Aurora . . . did not advise them that an [OIC] was ever an option." Respondents' Mem. at 18. Therefore, argue Respondents, their "failure to secure competent representation (i.e., who would be aware of the applicability of an ETA Offer) while being investigated by the [r]evenue [o]fficer should not impact the merits of their case." Id.

Respondents contend that Mr. Dubberly's testimony that he is willing to pay part of Respondents' debt is a "guarantee to fund an [ETA] Offer, which should be more convincing to the Court than an [ETA] Offer submission by itself." Reply at 7. Respondents assert that they are eligible for an ETA Offer because "the sale of [the Property] would cause them an economic hardship." Respondents' Mem. at 16. According to Respondents, "their home is their sole remaining asset for retirement, they cannot afford rent, and due to [their] advancing

ages[,] they will find it difficult to earn additional income to pay for food, clothing and shelter." Id. at 17. Respondents state that "[i]f the Court determines filing an [OIC] is necessary for a 'collection alternative' to exist," then they "propose that the Court require . . . Respondents to file an [OIC] within thirty . . . days of the Court's determination." Reply at 8.

Alternatively, Respondents argue that "[i]f the Court is not convinced that the availability of an ETA Offer is fatal to the case of Petitioner, then [Respondents] should be permitted the ability to market and sell the property at its highest and best price." Respondents' Mem. at 19. According to Respondents, "the forced sale of the Property would result in proceeds less than the current encumbrances against the Property." Id. Respondents contend that their request for a private sale of the Property "is proposed as a last resort and is primarily due to the minimal funds that the [IRS] anticipates realizing from the forced sale." Reply at 10.

### 2. Revenue Officer's Consideration of ETA Offer

Respondents argue that the IRS did not make "an actual determination regarding hardship and alternatives to collection." Respondents' Mem. at 18. According to Respondents, in concluding that an OIC was not viable, Revenue Officer Williams "determined that there would be no hardship, apparently because [Respondents] could borrow unlimited sums of money from [Mrs.] Gower's mother." Id. Respondents contend that Revenue Officer Williams erred in doing so because the factors used in determining whether collection would cause economic hardship "do not reference an ability to borrow from family members." Id. Respondents assert that "[t]he existence of a viable collection alternative and

the [r]evenue [o]fficer's failure to comply with the applicable Treasury Regulations and [IRM] provisions should be deemed fatal to the . . . Petition." Id. at 19.

### 3. Pending Installment Agreement

Respondents finally contend that "the [IRS] is statutorily barred from levy or seizure of the Property" because "there was a [p]ending [i]nstallment [a]greement as of January 23, 2014 on all tax years at issue, excluding 2013." Id. at 20. According to Respondents, their installment agreement requests "are not frivolous." Reply at 8.

## B. Petitioner's Arguments

### 1. Reasonable Alternatives for Collection

Petitioner asserts that there are no reasonable alternatives for collection and that Respondents failed to show there are other assets from which the liability can be satisfied. Petitioner's Resp. at 5-12; Sur-Reply at 1-2; see 26 C.F.R. § 301.6334-1(d)(1)-(2). Petitioner contends Mr. Dubberly's offer to fund an OIC is insufficient to show that there are reasonable alternatives for collection because "such an offer is hypothetical, since neither Mr. Dubberly nor . . . Respondents have made any such offer to the IRS." Petitioner's Resp. at 8. Further, argues Petitioner, the amounts Mr. Dubberly is willing to pay are insufficient to satisfy the tax liabilities. Id. Petitioner also asserts that "[c]ompromising [Respondents'] tax liabilities in these circumstances would undermine compliance with tax laws, and would not encourage taxpayers to view the tax laws as fair and equitable." Id. at 11 (citations omitted).

Petitioner contends that Respondents' offer to sell the Property at market value is not a reasonable alternative for collection because the "IRS [previously] pursued having . . . Respondents sell the Property but, because of [their] unwillingness, that was not

a viable collection alternative." Id. at 15. Petitioner also asserts that "a grant of the Petition does not mean that a levy will issue or that . . . Respondents will be precluded from pursuing a private sale of their home." Id. (citation omitted).

### 2. Revenue Officer's Consideration of ETA Offer

As to Revenue Officer Williams's determination regarding the applicability of an OIC in Respondents' case, Petitioner argues that Respondents "have not made an [OIC], and the fact that they have sufficient equity in the Property makes them ineligible for . . . an [OIC]." Id. at 5. Petitioner asserts that "[a]n offer is a prerequisite to engaging in an [OIC]—otherwise the IRS is negotiating against itself." Sur-Reply at 3. According to Petitioner, prior to the issuance of the levy, "[h]ardship is only a consideration in the IRS's analysis of an ETA [O]ffer, which . . . Respondents did not make and for which they are not eligible . . . ." Petitioner's Resp. at 6 n.6. Petitioner asserts that "hardship is not a factor for the Court to consider in analyzing the Petition." Id. "In any event," contends Petitioner, "Revenue Officer [Williams] considered the appropriateness of an [OIC], which is all that she was required to do." Sur-Reply at 3.

### 3. Pending Installment Agreement

Lastly, Petitioner argues that because Respondents' installment agreement requests are "frivolous on their face, the IRS can formally deny the pending request[s] for an installment agreement and eliminate the restriction [they] impose[ ] before issuing a levy." Petitioner's Resp. at 12; see also id. at 13-14. Petitioner further asserts that while "[26 U.S.C. §] 6331(k) imposes some restrictions on the IRS before a levy is issued . . . , it does not prohibit the Court from granting the Petition." Id.

## V. Conclusions of Law

The undersigned finds that Petitioner has made a prima facie showing that the levy is appropriate by demonstrating that the underlying tax liabilities have not been satisfied, all legal requirements and administrative procedures pertaining to the levy have been met, and there are no reasonable alternatives for collection of Respondents' debt. See 26 C.F.R. § 301.6334-1(d)(1). Respondents have failed to rebut Petitioner's prima facie case. The undersigned addresses the issues raised by Respondents in the following order: 1) whether Petitioner established that there are no reasonable alternatives for collection; 2) whether Revenue Officer Williams's determination that Respondents were ineligible for an OIC was incorrect; and 3) whether the pending installment agreements prohibit levy of the Property.

Respondents have not shown that there are other assets from which the tax liabilities can be satisfied. Respondents' proposed alternatives—an OIC funded by Mr. Dubberly and a private sale of the Property—do not constitute reasonable alternatives for collection. Mr. Dubberly's offer to pay a lump sum of $40,000 or "up to [$]75,000" in monthly installments, Tr. at 105, is inadequate as these amounts are insufficient to satisfy Respondents' $153,235.45 debt, and the expected net proceeds of the forced sale of the Property ($142,833.45) far exceed Mr. Dubberly's offer. In any event, an OIC has not been submitted,[37] and the offers made by Mr. Dubberly are merely hypothetical. Thus, Mr. Dubberly's offer to fund an OIC does not constitute a reasonable alternative for collection.

---

[37]     If Respondents submit an OIC, only the Attorney General or his delegate may compromise the tax liability because this matter was already referred to the DOJ for prosecution; thus, the IRS no longer has authority to accept an OIC. See 26 U.S.C. § 7122(a). It is not clear from the record when the matter was referred to the DOJ, but it was some time before August 23, 2016. See Respondents' Ex. 3 (Doc. No. 15-14 at 63) (August 23, 2016 note indicating, "[M]oving forward w/DOJ on suit").

See In re Atkinson, 2009 WL 2187537, at *3 (finding that a $23,800 home equity loan does not constitute a reasonable alternative for collection because "the levy and sale of [the r]espondent's residence will likely allow the IRS to recover more than this amount and may even result in full satisfaction of [the r]espondent's debt of approximately $54,000"); In re The Tax Indebtedness of Hattrup, 118 A.F.T.R.2d (RIA) 2016-6584 (D. Kan. Feb. 10, 2016) (finding that "[b]ecause any future income from [a] start-up business is highly speculative, it is not sufficient to show that [the] respondent has the present ability to satisfy the tax liability").[38]

Likewise, a private sale of the Property is not a reasonable alternative for collection. Respondents' argument that the Petition should be denied because the forced sale of the Property will likely yield less proceeds than a private sale of the Property is not persuasive. As noted above, when Respondents sold their former residence in Tampa, they did not use any of the proceeds to pay their outstanding tax liabilities for tax years 2008 through 2011. Tr. at 145. Instead, they used the entirety of the proceeds ($223,152.20) to purchase the Property. Tr. at 145; Petitioner's Ex. 8 (Doc. No. 15-9 at 2). Further, in November 2014, the IRS suggested that Respondents sell the Property and provide the IRS with the proceeds,

---

[38]    Respondents' reliance on United States v. Henry, No. 8:08-cv-1265-T-27MAP, 2008 WL 5413156 (M.D. Fla. Nov. 3, 2008) is misplaced. Citing Henry, Respondents argue that an OIC is a reasonable alternative for collection because they filed their 2014 and 2015 tax returns. See Respondents' Mem. at 15-16. In Henry, this Court granted the Government's petition for approval of levy after finding, inter alia, that no reasonable alternatives for collection existed. Henry, 2008 WL 5413156, at *4. The Court noted the "[d]efendant remain[ed] ineligible for alternatives such as an [OIC] because she ha[d] failed to file her tax returns for multiple tax years since 1995." Id. The Court did not hold, however, that taxpayers who have outstanding tax liabilities are eligible for an OIC as long as they file their tax returns. Here, whether Respondents filed their 2014 and 2015 tax returns is irrelevant for purposes of approving or denying the Petition. As noted, an OIC is not an alternative for collection because Respondents have not made an OIC, and the offers made by Mr. Dubberly at the hearing are insufficient to satisfy Respondents' debt and are hypothetical.

Petitioner's Ex. 5 (Doc. No. 15-6 at 2); but Respondents never did so, Tr. at 34.[39] This conduct evidences a lack of genuine willingness on Respondents' part to sell the Property to satisfy their outstanding tax liabilities. The undersigned finds no support for the proposition that the Petition should be denied based on Respondents' mere suggestion that they are willing to sell the Property. If Respondents wish to sell the Property, a grant of the Petition does not preclude Respondents from attempting to reach an agreement with the IRS to avoid a forced sale of the Property.[40] See United States v. Peterson, No. C-08-04709RMW, 2009 WL 322867, at *1-2 (N.D. Cal. Feb. 9, 2009) (granting petition for approval of levy even though the respondent "appear[ed] to be working hard to pay the government," and the respondent "stated that he [was] trying to obtain a loan on the home to permit him to pay his tax debt").

As to Respondents' argument regarding Revenue Officer Williams's conclusion that they were ineligible for an OIC, this argument is meritless because, as noted, Respondents never submitted an OIC. Although Revenue Officer Williams's seizure memorandum erroneously states that an OIC was considered, she testified at the hearing that an OIC was never filed, so there was no OIC to consider. Respondents' Ex. 3 (Doc. No. 15-14 at 39) (seizure memorandum); Tr. at 64 (testimony). Because the record shows that Respondents

---

[39]     The IRS also suggested to Respondents other alternatives for collection, such as cashing out their 401(k) or obtaining a loan against the remaining cash value of their life insurance policies. See Petitioner's Ex. 5 (Doc. No. 15-6 at 2). Respondents, however, never provided the IRS with these proceeds. See Tr. at 34; Respondents' Ex. 3 (Doc. No. 15-14 at 36).

[40]     Respondents' argument that the forced sale of the Property will result in proceeds less than the encumbrances against the Property is also unpersuasive. The value of the Property and the amount of any encumbrances are moving targets. A realistic property value and an accurate determination of the amount of the encumbrances are matters that have to be determined close in time to the Property being placed on the market, whether the sale is private or forced.

never filed an OIC, it is clear that Revenue Officer Williams would not have considered an OIC. Thus, given that there was no OIC for the IRS to consider, the IRS was not required to take into account equitable considerations—such as whether levy of the Property would cause economic hardship on Respondents—when considering alternatives for collection.

Further, such equitable considerations play no role in the Court's determination of whether to approve a levy upon the Property. See United States v. DelVecchio, No. 09-14247-CIVLYNCH, 2010 WL 2600697, at *3 (S.D. Fla. Mar. 12, 2010) (finding "[t]here is simply no requirement under the law that the government satisfy [the r]espondents' ephemeral standard of 'addressing the question of economic hardship' before levying a delinquent taxpayer's principal residence"). Respondents had the opportunity to challenge the appropriateness of the levy at a CDP hearing. See 26 U.S.C. § 6330(c)(2); 26 C.F.R. § 301.6330-1. Despite being notified of their right to request a CDP hearing, Respondents never requested one. See Tr. at 28, 154-55; Petitioner's Ex. 7 (Doc. No. 15-8 at 2-9) (notices advising Respondents of right to request CDP hearing). If the IRS ultimately levies upon the Property, Respondents may request a release of the levy under 26 C.F.R. § 301.6343-1 and raise the issue of economic hardship at that time.[41] But, as Respondents concede, "the Court is not instructed to look at hardship as a specific cause to deny the Petition . . . ." Respondents' Mem. at 17. As to Respondents' request that the Court require them to file an OIC within thirty days of this Order, Respondents offer no legal authority, nor can the undersigned find any, requiring or allowing the Court to do this.

---

[41] The IRS may then consider the impact, if any, of Mrs. Gower's mother's death on Respondents' financial situation and whether the $20,000 they borrowed from her in 2014 is an indicator of economic hardship in light of their various expenditures during 2014. See supra at p. 21.

To the extent Respondents contend they were "unaware" of the applicability of an ETA Offer to their situation, id. at 18, Revenue Officer Williams provided them with documents containing information about OICs. See Tr. at 41-42; Respondents' Ex. 3 (Doc. No. 15-14 at 18, 42). Moreover, Respondents' "failure to secure competent representation (i.e., who would be aware of the applicability of an ETA Offer) . . . ," Respondents' Mem. at 18, is not a basis for denying the Petition.

Finally, the pending installment agreements do not prohibit the IRS from levying upon the Property. The undersigned finds that the proposed installment agreements were submitted "solely to delay collection" because there is clearly no reality to Respondents' requests to make periodic, token payments of $1 and $20 a month. See 26 C.F.R. §§ 301.6159-1(f)(2), 301.6331-4(a)(4); IRM 5.11.1.4.8(4), 2007 WL 9242947 at *2.[42] Indeed, Mrs. Gower's testimony appears to indicate that the installment agreement requests were not a genuine offer to settle Respondents' tax liabilities; instead, they were an attempt to "get some type of response" from the IRS. Tr. at 150. Thus, the pending installment agreements do not bar the Court from approving the Petition.

## VI. Conclusion

Based on the foregoing, the undersigned finds that Petitioner has demonstrated by a preponderance of the evidence that the underlying federal income tax liabilities for the 2008 through 2013 tax years have not been satisfied, Petitioner has followed all requirements of applicable law and administrative procedure relevant to the levy, and there

---

[42]     The undersigned notes, however, that the IRS is not bound by the Court's finding, and it may make its own determination as to whether the installment agreement requests were submitted solely to delay collection. See 26 C.F.R. §§ 301.6159-1(f)(2), 301.6331-4(a)(4).

are no reasonable alternatives for collection of Respondents' debt. Respondents have failed to rebut Petitioner's prima facie showing.

Accordingly, it is

**ORDERED**:

1.      The Petition for Judicial Approval of a Levy upon a Principal Residence (Doc. No. 1) is **GRANTED**.

2.      The Internal Revenue Service is permitted to levy upon the principal residence of James N. Gower and Valencia D. Gower, located at 95012 Sunflower Court, Fernandina Beach, Florida 32034 ("the Property"), to satisfy part or all of their unpaid federal income tax liabilities for the tax years 2008 through 2013. The Property is legally described as follows:

> Lot 145, AMELIA NATIONAL UNIT ONE, according to Plat thereof as recorded in Book 7, Pages 48 through 71, inclusive of the Public Records of Nassau County, Florida. Parcel ID # 1505160003058000.

3.      The levy shall be executed by any authorized officer of the Internal Revenue Service.

4.      The Clerk is directed to terminate any pending motions and close the case.

**DONE AND ORDERED** at Jacksonville, Florida on July 10, 2018.

James R. Klindt

**JAMES R. KLINDT**
United States Magistrate Judge

bhc
Copies to:
Counsel of record